[663 NYS2d 184]

AGNES MARTIN, Appellant, v GWEN L. BRIGGS et al., Respondents, et al., Defendant.

First Department, October 28, 1997

### APPEARANCES OF COUNSEL

*Arthur J. Ginsburg* of counsel, New York City *(Martin Garbus, Jeanne Hamburg* and *Gerald E. Singleton* on the brief; *Frankfurt, Garbus, Klein & Selz, P. C.,* attorneys), for appellant.

*Mark J. Lawless* of counsel, New York City *(Thomas G. Amon* on the brief; *Amon & Sabatini,* attorneys), for respondents.

### OPINION OF THE COURT

SULLIVAN, J. P.

This appeal is from, *inter alia,* the grant of summary judgment dismissing the complaint of Agnes Martin, a renowned American artist, now 85 years of age, who seeks to recover possession of more than two dozen of her paintings from defendants Gwen Luce Briggs and Jean Davis, successors in possession to their mother, who took sole possession of the paintings on the death of her husband, an original bailee. Without ever addressing defendants' Statute of Limitations or laches defense, the sole basis of their summary judgment motion, the IAS Court, finding that the paintings had been originally left with their stepfather, who died in 1972, and that defendants were not parties to any bailment with respect to the paintings, dismissed the complaint for failure to state a cause of action, a ground neither party addressed. The court permitted the complaint to stand against Sotheby's, which retains custody of the paintings pending the outcome of this action, leaving unresolved defendants' continuing claim of ownership of the paintings. The court also denied leave to serve an amended complaint asserting defendants' continued possession of several additional paintings but permitted service of such complaint on Sotheby's, which, concededly, does not have possession of the additional paintings.

In 1967, Martin left New York, where, since 1958, she had lived and worked, producing a substantial body of work, which, for the most part, had been consigned to galleries for sale. Prior to her departure, Martin entered into an agreement for the storage of her unconsigned paintings with Arthur Kimball (Kim) Blood and, as Martin claims, his wife, Lois Luce Blood, both of whom were artists and acquaintances of Martin. Defendants, two of Lois's three children from an earlier marriage, contend that the bailment agreement was with Kim Blood alone. In any event, in exchange for Martin's agreeing to allow the Bloods to reside in her Manhattan loft for the remaining term of her lease, the Bloods, Martin alleges, agreed to store her paintings until such time as Martin demanded their return. The Bloods stored the paintings in the studio loft for the six months that they resided there. Afterwards, they stored the paintings at their residence in Sherman, Connecticut.

In 1972, Martin visited the Bloods in Sherman and took some of her paintings, which, at the request of a friend, an art dealer, she consigned for sale. It was, according to Martin, understood that, pending a demand for their return, the Bloods would continue to store the balance of the artwork, which is the subject of this litigation. These paintings, properly restored and authenticated, are estimated to have a value of $1.4 million and represent the largest single body of Martin's work in the possession of anyone other than the artist herself.

Kim Blood died in 1972. Lois continued to store the artwork and, although she had 10 to 20 paintings of her own that she put on display in her home, she never showed any of Martin's. In the fall of 1988, Lois became ill and was hospitalized for several months, at the conclusion of which Briggs and her husband took up temporary residence at her Sherman home to take care of her. The Sherman house was sold in 1990 and Lois moved with Briggs and her husband into a rented house in Rowayton, Connecticut, where Lois resided until her death in 1991. The paintings were stored in the basement of the rented Rowayton house. When Briggs and her husband moved to their present residence in Rowayton, Briggs placed the paintings in a storage bin in Norwalk, Connecticut, where they remained until 1995, when Briggs retrieved them and consigned them to Sotheby's. The other defendant, Davis, has never had physical possession of the paintings. It is undisputed that Martin did not know of Lois Blood's death in 1991 and only learned of defendants' claim to ownership when informed by Sotheby's of

the need to authenticate her work. It was at this point that Martin demanded the return of her paintings.

Defendants resist Martin's claim to the paintings on the basis of an alleged gift from their mother in 1988, 16 years after the death of Kim Blood. Allegedly, in the summer of that year, on one of their regular visits to their mother, Briggs and Davis, in helping her with her housework, discovered the artwork. It was on this occasion, defendants contend, after the paintings had been taken from the various places in the Sherman house where they had been stored and laid out on the front lawn, that Lois made them a gift of the paintings. According to Davis, Lois, speaking of her own paintings and the others, remarked, "you should have these and take care of them." The paintings in issue were not divided between Briggs and Davis but, instead, taken back into the house and placed in a storeroom. Concededly, Davis took other gifts, including her mother's paintings that she had received that day, back to her Michigan home. Even after her mother's death, Briggs made no effort to divide the subject paintings with her sister. Instead, as noted, when Briggs moved to her present residence, she placed the paintings in a storage bin in Norwalk, Connecticut, where they remained until the consignment to Sotheby's for sale. Although they displayed other pieces of art that they owned in their homes, with the exception of a single Martin painting that Briggs displayed, neither Briggs nor Davis ever showed any of the paintings or had them appraised or insured.

■ On appeal, defendants do not attempt to justify the IAS Court's determination on the sole ground stated, i.e., legal insufficiency. They argue instead, as they did before the IAS Court, that Kim Blood was Martin's only bailee and that the Statute of Limitations for an action seeking the recovery of the paintings began to run in 1972, when he died. It was then, they argue, that the paintings were converted by Lois Blood and it was then that Martin's right to demand their return was complete under CPLR 206 (a). Alternatively, they argue, if an actual demand, as opposed to the right to make a demand, and refusal were required to start the running of the limitations period, then Martin was required to make a demand for their return within a reasonable time after she learned of the death of the bailee. As a matter of law, they argue, the 23-year delay after the death of Kim Blood is unreasonable. In this regard, defendants argue, the long delay was accompanied by the death of the only witness, besides Martin, to the initial bailment. Thus, laches should bar the claim. While these is-

sues were never reached by the IAS Court, they have been preserved. Based on our review of the record, this is not a case for summary disposition. Accordingly, we reverse.

In reaching its determination, the IAS Court violated well-established standards for disposing of summary judgment motions. Instead of reviewing the record to determine whether issues of fact exist, the court itself resolved those issues in finding that Martin's bailment was with Kim Blood alone and that defendants never agreed to or did act as bailees of the paintings. Summary judgment is a drastic remedy which "deprives the litigant of his day in court * * * [and therefore] should only be employed when there is no doubt as to the absence of triable issues." (*Andre v Pomeroy*, 35 NY2d 361, 364; *Phillips v Kantor & Co.*, 31 NY2d 307, 311.) In considering a summary judgment motion, evidence should be analyzed in the light most favorable to the party opposing the motion. (*Blake-Veeder Realty v Crayford*, 110 AD2d 1007, 1008.) The key to summary judgment resolution is " 'issue-finding, rather than issue-determination'." (*Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395, 404, quoting *Esteve v Abad*, 217 App Div 725, 727.)

Here, Martin contends that she entered into a bailment with both Bloods and that this bailment, by legal implication, continued after the death of Lois, the surviving bailee. Alternatively, she argues, if the bailment was with Kim Blood alone, then Lois and, at her death, defendants successively acted as constructive bailees. Relying on certain inconsistencies in her deposition testimony, defendants deny the existence of any bailment except with Kim Blood and claim that, at the time of his death, their mother converted the paintings. Thus, an issue of fact exists as to whether defendants, and their mother before them, were acting as bailees, in which event Martin's claim would not accrue until defendants refused her demand for the return of the paintings.

*Wichner v Fortunoff* (107 AD2d 585) involved a similar fact pattern. In that case, this Court reversed the grant of summary judgment dismissing a conversion cause of action against an alleged survivor bailee on Statute of Limitations grounds, refusing to dispose summarily of the question of whether a bailment with the survivor existed. Rather than find, as the IAS Court did here, that the bailment terminated upon the death of one of the two alleged joint bailees, the court implicitly ruled that the death of a bailee did not foreclose the issue of a continuing bailment with the bailee's son, even though the son denied that he had ever been a bailee.

Moreover, in finding that the original bailment was solely with Kim Blood and that his death terminated the bailment, the IAS Court ignored the legal argument that Lois Blood, by her conduct, became a constructive bailee of the paintings upon her husband's death and that defendants similarly became constructive bailees after she died. A "[b]ailment does not necessarily and always, though generally, depend upon a contractual relation. It is the element of lawful possession, however created, and duty to account for the thing as the property of another that creates the bailment, regardless of whether such possession is based on contract in the ordinary sense or not." (*Foulke v New York Consolidated R.R. Co.*, 228 NY 269, 275.) A bailment "may arise from the bare fact of the thing coming into the actual possession and control of a person fortuitously, or by mistake as to the duty or ability of the recipient to effect the purpose contemplated by the absolute owner." (*Phelps v People*, 72 NY 334, 358.) A bailment "may be created by operation of law. It is the element of lawful possession, and the duty to account for the thing as the property of another, that creates the bailment, whether such possession results from contract or is otherwise lawfully obtained. It makes no difference whether the thing be intrusted to a person by the owner or by another. Taking lawful possession without present intent to appropriate creates a bailment." (*Seaboard Sand & Gravel Corp. v Moran Towing Corp.*, 154 F2d 399, 402 [2d Cir]; *see, Mack v Davidson*, 55 AD2d 1027.)

In this connection, the record shows that, after her husband's death, Lois Blood never acted as though she owned the paintings. Rather, her actions were consistent with the continuation of the bailment. Nor did defendants, after taking possession from their mother, demonstrate any indicia of an intent to appropriate the paintings. Instead, they stored them for four years until consigning them to Sotheby's in 1995 and thereafter refused Martin's demand for their return. Nor did Lois Blood or defendants ever report the tax consequences of the alleged 1988 gift. Thus, at the very least, the record presents a factual question not only as to whether Lois Blood was a bailee, express or implied, but also as to whether defendants, as constructive bailees, succeeded to her obligation.

Defendants, claiming that the death of Kim Blood, by itself, terminated the bailment, argue that Martin may not treat the bailment as a continuing one and should have sued either in contract or tort to enforce her rights. While that may be the rule in a bailment for a specific term (9 NY Jur 2d, Bailments

and Chattel Leases, § 136), the bailment at issue, under either side's version, was for an indefinite duration. In such a case, absent notice of termination by either of the parties, a bailor is entitled to follow the bailed property into the hands of the bailee's successors (*id.*, § 120).

With respect to defendants' Statute of Limitations argument, it is undisputed that this action was commenced within five months of defendants' June 1995 refusal of Martin's demand for the return of the paintings. In a chattel bailment of indefinite duration, the Statute of Limitations does not begin to run against a bailee in lawful possession until the bailor makes a demand for the chattel's return and the demand is refused. (*Pine Hill Concrete Mix Corp. v Alto Corp.*, 25 AD2d 608, 609, *affd* 19 NY2d 770; *see*, *Wichner v Fortunoff*, 107 AD2d, *supra*, at 586; *Hoelzer v City of Stamford*, 933 F2d 1131, 1137.) In such a case, the conversion does not accrue until there is a " 'denial or violation of the plaintiff's dominion, rights or possession'." (*Sporn v MCA Records*, 58 NY2d 482, 487.) The bailee's dealing with the property must ordinarily be wholly inconsistent with the contract of bailment. (9 NY Jur 2d, Bailments and Chattel Leases, § 49.) According to Martin, until the consignment of the paintings to Sotheby's, neither Lois Blood nor defendants ever acted in a manner inconsistent with Martin's claim of a continuing bailment. Thus, a claim for conversion could not accrue prior to defendants' refusal, in June 1995, to return the paintings. Hence, Martin argues, the action, commenced in November 1995, was timely.

Defendants argue that Martin's claim is time barred because she unreasonably delayed demanding the return of the paintings. An owner of property who has knowledge of its location cannot unreasonably delay making demand upon the person possessing the property. (*Guggenheim Found. v Lubell*, 77 NY2d 311, 319.) Thus, the demand that is necessary to start the running of the Statute of Limitations must be made within a reasonable time. (*Matter of Hamilton*, 145 Misc 2d 273, 275; *Heide v Glidden Buick Corp.*, 188 Misc 198, 199; *see*, CPLR 206 [a] [2].) Martin's only excuse for not demanding the return of the paintings for these many years is forgetfulness. Of course, as noted, she contends that she had an express contract of bailment with both Bloods and was entitled to rely upon the performance of the bailment by Lois, the survivor. Concededly, she did not learn of Lois's death until after she heard from Sotheby's. Thus, given her account of the circumstances, she had no reason to believe that the bailment had terminated or

that her ownership of the paintings was in jeopardy. There is, as noted, no indication of record that defendants, assuming that they became constructive bailees at their mother's death in 1991, ever violated or denied Martin's right to or possession of the paintings until, as Martin alleges, defendants refused her demand for the return of the paintings after their consignment to Sotheby's in early 1995. Thus, the conflicting versions of events as to the terms of the bailment and the nature of Lois Blood's and defendants' possession of the paintings after Kim Blood's death and the reasonableness of Martin's delay in demanding the return of the paintings raise questions of fact as to the Statute of Limitations defense.

As to laches, injury or prejudice is an essential element of such a defense. (*Dwyer v Mazzola*, 171 AD2d 726, 727.) While there is no evidence that, until 1995, defendants did anything in the four years after their mother's death and prior to the consignment of the paintings to Sotheby's or during the 24 years that their parents held the paintings in reliance on the delay, that delay may well have prejudiced the defense of this action and may be sufficient to sustain a defense of laches. That issue, however, cannot be determined as a matter of law.

Martin's cross motion seeking leave to serve an amended complaint to assert that defendants were constructive bailees and to add two additional paintings in defendants' possession to the recovery sought should have been granted. Leave to amend should be freely given absent any prejudice or surprise from a delay in seeking leave. (*McCaskey, Davies & Assocs. v New York City Health & Hosps. Corp.*, 59 NY2d 755, 757.) The proposed amendment causes no legal prejudice to defendants.

Accordingly, the judgment of the Supreme Court, New York County (Norman Ryp, J.), entered March 5, 1997, which dismissed the complaint against defendants Briggs and Davis, should be reversed, on the law, with costs and disbursements, said defendants' motion for summary judgment denied and plaintiff's cross motion for leave to serve an amended complaint against defendants Briggs and Davis granted. Appeals from the orders of the same court and Justice, entered December 5, 1996 and February 28, 1997, to the extent they dismissed the complaint against defendants Briggs and Davis, should be dismissed as subsumed by the appeal from the judgment, without costs.

ROSENBERGER, WALLACH, RUBIN and ANDRIAS, JJ., concur.

Judgment, Supreme Court, New York County, entered March 5, 1997, reversed, on the law, with costs and disburse-

ments, defendants Briggs' and Davis' motion for summary judgment denied, and plaintiff's cross motion for leave to serve an amended complaint against said defendants granted. Appeals from orders, same court and Justice, entered December 5, 1996 and February 28, 1997, dismissed as subsumed by the appeal from the judgment, without costs.